**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| OUTLOGIC, LLC,<br><br>Plaintiff,<br><br>v.<br><br>ADVAN RESEARCH CORPORATION, LLC,<br><br>Defendant. | Case No. ________________ |

## COMPLAINT FOR DECLARATORY JUDGMENT

Plaintiff, Outlogic, LLC ("Outlogic"), by counsel, pursuant to 28 U.S.C. §§ 1332, 1391, and 2201, for its Complaint for Declaratory Judgment against Defendant, Advan Research Corporation, LLC ("Advan"), states as follows:

## THE PARTIES

1. Outlogic is a Virginia limited liability company with its headquarters and principal place of business in Virginia. The sole member of Outlogic is Digital Envoy, Inc., a Georgia corporation with its principal place of business in Georgia.

2. Advan is a Delaware limited liability company with its headquarters and principal place of business in New York. Advan's CEO and founder is Yiannis Tsiounis, who lives in France. Upon information and belief, none of Advan's members reside in Georgia.

## JURISDICTION AND VENUE

3. Personal jurisdiction over Advan exists in New York because Advan's principal place of business is in New York, and because the contract at issue in this case contains a forum selection clause, which states that "The exclusive venue for any action relating [sic] this Agreement shall be in a court of competent jurisdiction located in the State of New York."

4. This Court has subject matter jurisdiction under 28 U.S.C. § 1332 because there is

complete diversity and the amount in controversy, excluding interest and costs, exceeds $75,000 based upon the value of the contract at issue.

5. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because Advan is considered a resident in this judicial district and a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

## FACTUAL BACKGROUND

### Outlogic and Advan

6. Outlogic and Advan are participants in a segment of the data industry that relies on data collected from users of mobile devices that can be aggregated and analyzed for marketing and business development initiatives.

7. This data typically is collected through applications running on mobile devices whose users have consented to the collection and use of specific kinds of information.

8. Generally speaking, there are four levels of participants in this field: (1) companies that own and operate applications that collect raw data at the user level; (2) companies that work directly with mobile application owners to control the quality of data collection and privacy compliance, and then analyze and aggregate the data published by application owners; (3) aggregators that collect massive amounts of data (typically from other aggregators) which has statistically minimal amounts of high quality data coming directly from mobile app or background location data and which is riddled with inaccuracies; and (4) companies that process the aggregated data from "Level 2" and/or "Level 3" participants to create products that can be further sold or licensed to individual businesses.[1]

---

[1] Given the role played by Level 2 and 3 participants, they could be described as a single layer in the industry. This Complaint distinguishes between them based on the quality of data provided

9. Outlogic is primarily a Level 2 company that collects, analyzes, and aggregates high-quality data related to users of mobile devices ("Data"), which data may be used by other businesses for analytics and measurements.

10. Advan is a Level 4 research company that utilizes and processes aggregated data from Outlogic (and from one other Level 2 company similar to Outlogic and at least one Level 3 low-quality data aggregator), to sell products to businesses in the financial sector.

11. Although mobile devices collect many kinds of information from users, Outlogic primarily aggregates geolocational Data that can be further analyzed by companies like Advan to provide usable products for its customers.

12. For example, the Agreement (defined below) permits Advan to use Outlogic data to identify certain "Audiences" like "Frequent Moviegoer" or "Interest: Sports," and to create "Insights," which the Agreement defines as "segments or classifications of Users that [Advan] develops based upon" the Data received.

13. Advan, in turn, licenses these Audiences and Insights to other businesses that would be interested in marketing to specific groups (*e.g.*, individuals who like movies or sports), or who can use the aggregated data to make business development decisions (*e.g.*, where to locate a sports bar store based on the interests of nearby residents).

**Overview of the Data Industry**

14. The collection and use of data by mobile device applications and websites has been a subject of ongoing debate.

---

and how it is typically collected, *i.e.*, directly from mobile applications (Level 2) or from other aggregators (Level 3).

15. Many applications require access to certain data in order to function; for example, a map application may need a user's location in order to provide directions. Other information regarding a user's daily activities can also be used beneficially to connect users with services and products they are interested in or to offer suggestions related to those activities.

16. On the other hand, some individuals prefer not to have their data used at all. There also have been some highly visible examples of unscrupulous actors using data illegally or for purposes for which the user did not intend or consent. Often, these "bad actors" become pariahs temporarily or permanently depending on the nature of the breach of public trust and the steps taken to address the breach.

17. Given the sensitive nature of the data being collected, the data industry is highly regulated on a national and state level in the United States and globally.

18. Indeed, in the few years since the Agreement was executed in 2018, many jurisdictions both in the United States and abroad responded to growing concerns about the theft and/or improper use of personally identifying information by enacting or expanding privacy laws that further restrict the collection and dissemination of such information. For example, data collected from or about individuals located in the European Economic Area or the United Kingdom that can be used directly or indirectly to identify an individual person, qualifies as "personal data" subject to regulation under the General Data Protection Regulation adopted in the European Union and the United Kingdom (collectively, the "GDPR"), which became effective after the parties executed the Agreement. See EU General Data Protection Regulation (GDPR): Regulation (EU) 2016/679 of the European Parliament and of the Council of 27 April 2016; Data Protection Act 2018 (UK).

19. Recently, strict privacy laws also have been adopted in multiple states, including,

California, Connecticut, Colorado, Virginia and Utah. See (Cal. Civ. §§ 1798.100, et seq.) (effective January 1, 2023); Connecticut Data Privacy Act, S.B. 6, 2022 Gen. Assemb., Reg. Sess. (Conn. 2022) (effective July 1, 2023); Colo. Rev. Stat. §§ 6-1-1301, et seq. (effective July 1, 2023); Va. Code Ann. §§ 59.1-575, et seq. (effective January 1, 2023); Utah Code Ann. §§ 13-61-101, et seq. (effective December 31, 2023).

20. While each of these laws addresses privacy concerns, they are not uniform with respect to what can be collected, what disclosure to and consent from users is required, and how data can be used after it is collected.

21. For example, the Data collected by Outlogic includes, in addition to other data elements, advertising IDs (which are unique alphanumeric strings assigned by the operating system manufacturer to each individual device), and latitude/longitude data, which together could potentially be used to identify, directly or indirectly, an individual person.

22. Outlogic also determines the purposes and means of processing the personal data of data subjects, including the behavior of such data subjects, located in the European Economic Area and United Kingdom, and, therefore, constitutes a "controller" of personal data subject to regulation under the GDPR. See EU General Data Protection Regulation (GDPR): Regulation (EU) 2016/679 of the European Parliament and of the Council of 27 April 2016; Data Protection Act 2018 (UK).

23. Whether and how advertising IDs may be used differs under the GDPR and the laws of other jurisdictions, *i.e.*, what may be legal in one jurisdiction may not be legal in another. Compare Cal. Civ. § 1798.100, et seq. with Va. Code Ann. §§ 59.1-575, et seq.

24. Compliance is made more difficult by the fact that these statutes typically do not include objective, easily identifiable rules, but rather subjective standards open to interpretation.

See, e.g., Va. Code Ann. § 59.1-578 (A)(1) ("A controller shall…Limit the collection of personal data to what is adequate, relevant, and reasonably necessary in relation to the purposes for which such data is processed, as disclosed to the consumer").

25. Accordingly, a data aggregator like Outlogic must ensure that its suppliers are following the applicable laws and regulations for disclosure, consent, collection and use and that its customers have a privacy-centric mindset and are not using that information for a purpose that is not permitted under the specific laws and regulations of particular jurisdictions.

**Practical Concerns**

26. In addition to legal limitations on the collection and use of data, participants in the data industry field must take into account broader social opinions regarding data-sharing policies. Even when applicable laws and regulations permit data collection and sharing, public perception that data-sharing policies are inappropriate can destroy a company's ability to survive or modify a company's willingness to be a participant in the data industry.

27. A governmental inquiry or negative publicity can impair a company's ability to operate and threaten its viability.

28. The best-known examples involve major social media applications and websites, *e.g.*, Apple and Facebook, that can withstand criticism, but the effect on smaller companies can jeopardize their very existence. See generally Olivia Solon & Cyrus Farivar, Mark Zuckerberg leveraged Facebook user data to fight rivals and help friends, leaked documents show, NBC News, Apr. 16, 2019 (also at https://www.nbcnews.com/tech/social-media/mark-zuckerberg-leveraged-facebook-user-data-fight-rivals-help-friends-n994706) (last visited on 12/20/22); Miguel Helft & Kevin J. O'Brien, Inquiries Grow Over Apple's Data Collection Practices, N.Y. Times, Apr. 21, 2011 (also at https://www.nytimes.com/2011/04/22/technology/22data.html) (last visited on

12/20/22).

29. The combined effect of legal limitations and the potentially devastating impact of negative publicity has raised the sensitivity at all levels in the data industry and increased costs of compliance.

30. As a result of these issues, application owners have imposed strict requirements on data aggregators regarding the permissible use of data. Disclosure and consent forms also have become more robust and limiting.

31. Because even a single governmental inquiry or negative reaction in the public can jeopardize a mid-level company's ability to exist, data aggregators like Outlogic have insisted upon broadly constructed contractual agreements to ensure that only permissible data has been collected and that it is used only as permitted by law and consistently with public expectations.

**Outlogic's Relationships with its Suppliers**

32. As a mid-level participant in the data industry, Outlogic has contractual relationships with both its suppliers and its customers.

33. On the supply side, Outlogic currently obtains most of its raw data directly from application owners or "publishers." Outlogic also obtains some data from a handful of its own applications and from other data aggregators.

34. Given the highly regulated nature of the industry and the sensitivity of the data, Outlogic's suppliers impose significant, legitimate restrictions on how raw data may be used to ensure that both the suppliers and Outlogic stay in compliance with applicable laws and regulations. If Outlogic <u>or</u> its customers fail to abide by these restrictions, Outlogic suppliers may stop providing the raw data necessary for Outlogic to operate its business.

35. Even if Outlogic fully complies with these contractual limitations, Outlogic's

access to suppliers is also subject to factors beyond its control. For example, in May of 2022, Outlogic lost 90% of its data supply when its largest supplier stopped providing data in response to an article that criticized the supplier's data-sharing policies.

36. Outlogic's predecessor faced a similar issue when the *Wall Street Journal* published an article about its data-sharing practices. Even though the article was wrong and demonstrated a lack of understanding of the technology used in the industry, several suppliers of data refused to do business with the company because of the article.

37. The cost associated with obtaining raw data can also fluctuate or change drastically depending on a number of factors, including the number of applications willing to sell data, the cost to the applications of doing so in compliance with the law, the amount of data available from applications (*e.g.*, whether sufficient data can be obtained from a small number of suppliers), and Outlogic's own costs for aggregating the data in compliance with the law.

38. The loss of Outlogic's largest supplier of data is a good example. Instead of having a large, primary source for data at a reasonable price, Outlogic was forced to backfill its supply from many smaller providers at a significantly increased cost.

**The Agreement**

39. On April 6, 2018 (the "Effective Date"), Advan and Outlogic's predecessor-in-interest ("Assignor") entered into a Data Monetization Agreement (the "Agreement") through which Assignor agreed to license certain aggregated data to Advan. A copy of the Agreement is attached as **Exhibit A**.

40. At the time that the parties executed the Agreement, Assignor was a start-up company and a new entrant in the data industry.

41. On April 17, 2020, Advan and Assignor entered into an Amendment to the

Agreement (the "Amendment"), a copy of which is attached as **Exhibit B**. The Amendment did not substantially alter the Agreement as it relates to the present litigation.

42. Although the Agreement as originally drafted complied with then-existing privacy laws, it did not contain provisions that are now considered standard with respect to newer privacy restrictions (*e.g.*, "EU Standard Contractual Clauses" necessary to comply with the GDPR).

43. The Agreement provided definitions for "Audiences" and "Insights" based on outdated laws and regulations as to what constituted "personally identifiable information" that are no longer applicable.

44. The Agreement only required Advan to comply with United States laws and regulations and not those applicable in foreign countries.

45. The Agreement also contained only limited restrictions on Advan's use of the Data based on the privacy environment at the time of execution.

46. In addition, the Agreement contained the following assignment provision:

> Neither party may assign this Agreement or assign or delegate its rights or obligations under the Agreement without the prior written consent of the other party, which consent shall not be unreasonably withheld or delayed. Any assignment or attempted assignment by either party without the other party's written consent shall be null and void. *Notwithstanding the preceding to the contrary, either party shall have the right to assign this Agreement to an Affiliate or any successor to its business or assets to which this Agreement relates, whether by merger, sale of assets, sale of stock, reorganization or otherwise*, provided that prompt notice of the same shall be given to the other party.

Ex. A § 16 (Emphasis added).

47. While this provision offers some protection to Outlogic if Advan attempts to assign the Agreement to another party, it offers no protection if the assignment results from a sale of Advan's business, even if the purchaser is a known "bad actor," is involved in a business likely to generate negative publicity, or is a competitor of Outlogic who would then have access to Outlogic's trade secrets.

48. The Agreement also lacked and still lacks other provisions ordinarily associated with long-term, renewable contracts.

49. For example, the fee provision in the Agreement does not include any mechanism for adjusting fees based inflation, increased costs, compliance with new laws, the availability of data, or for any other reason. Ex. A, at 7.

**Acquisition by Outlogic and Attempts to Address Concerns**

50. On May 25, 2021, Outlogic acquired substantially all of Assignor's assets and liabilities, including the Agreement (and its Amendment), which Assignor assigned to Outlogic.

51. Since the acquisition, Outlogic has taken a number of steps to ensure that it is and will continue to be in compliance with all applicable privacy laws and regulations and to address the expectations of suppliers.

52. Among other things, Outlogic has arranged its Data customers into several "verticals" based on the intended use of the Data. These include, for example, the FinTech vertical (for customers creating products for the financial industry) and the AdTech vertical (for customers focusing on marketing and advertising).

53. In addition to improving the organization of its business, these verticals help to ensure that Outlogic exercises greater control over the use of its data. For example, in some cases Data can be used and collected for one purpose but not another based on a law or regulation or the specific disclosure and consent used to collect the data.

54. By categorizing its customers according to verticals, Outlogic can ensure that its Data is only being used for proper purposes and complies with applicable laws and regulations.

55. In addition to realigning its business model, Outlogic, in response to public sentiment and supplier expectations, also made strategic business judgments about the companies

to which it will license its aggregated data. For example, while there is nothing inherently unlawful about selling data to the government, Outlogic has made the business decision that it will not sell data concerning U.S. citizens to the government for law enforcement purposes and will not be associated with companies that do so.

56. As part of its review of existing processes and procedures, Outlogic also undertook a comprehensive review of existing contractual agreements in light of recently adopted or expanded privacy laws that may affect the ability of Outlogic to continue licensing its Data.

57. As part of that review, Outlogic contacted its contractual counterparts to address gaps and other problematic provisions that would prevent Outlogic from continuing to provide Data to those parties.

58. In that context, Outlogic contacted Advan and requested that Advan agree to amend the Agreement to conform with Outlogic's current customary terms and conditions, including terms and conditions that would ensure compliance with constantly changing privacy laws and Outlogic's ability to control the use of its Data.

59. In particular, Outlogic raised three critical issues: (1) the need to amend the Agreement to comply with newly adopted privacy laws and to provide flexibility to address privacy laws that may be adopted in the future; (2) the need to amend the assignment provision to ensure that the Agreement would not be assigned to a disreputable company or a business that did not take privacy issues seriously and, thus, could damage Outlogic's business and jeopardize its survival; and (3) the need to limit the use of the Data for lawful purposes that are carefully delineated and would not invite a negative reaction from the public (*e.g.*, selling data to the government for law enforcement purposes).

60. As part of that discussion, Outlogic sent Advan a proposed Second Amendment

that addressed each of those issues, clarified certain outdated definitions, and clarified other related topics such as renewal.

61. Among other things, the proposed amendment included a list of "Prohibited Parties" to which Advan could not sell products either because they were competitors of Outlogic or had previously been the subject of a governmental inquiry investigation or public scrutiny because of their data-sharing policies.

62. It also included basic use restrictions to ensure that Advan only used the Data as permitted by the Agreement (and in the financial market in which Advan operates) and would not use the Data or sell it for use for other purposes over which Outlogic has no visibility or oversight and which could violate applicable laws and regulations.

63. The proposed Second Amendment also included a revised assignment provision that specified that the Agreement could not be assigned to an entity that had been "the subject of public disrepute, scorn or contempt or any governmental inquiry or investigation, proceeding or enforcement action or sanction relating to any data privacy concerns," or who refused to acknowledge and accept the data use limitations under the Agreement.

64. In initially responding to this proposal, Advan essentially rejected all of the proposed revisions and dismissed all of Outlogic's legitimate business concerns about needing to control the use of the Data and to comply with ever-changing privacy laws.

65. Advan claimed that the proposed privacy-related amendments were overreaching and unnecessary and stated that it would not consider the other proposed changes absent receiving additional consideration.

66. Advan also argued that it had a perpetual agreement and that, if Outlogic breached the Agreement, Outlogic would be liable for the present value of the entire stream of Advan's

future, perpetual business to the tune of tens of millions of dollars.

67. Advan had been making similar claims since at least as early as October of 2021 in discussions about revenue sharing.

68. In an email from Advan's owner to Outlogic on October 21, 2021, Advan's owner stated, "As for our usage and damages. First I detailed our usage and we do make money today. *Extrapolate this to the end of our contract (which is perpetual… infinity is a long time) and add up the revenue.* Even if we never made a penny the increase in revenue would increase the value of our company (you sold for a multiple of revenues even though you were losing money; it's a universal trend). Plus we hope that your usage will increase." (Emphasis added).

69. As support for its claim of perpetuity, Advan cited the renewal provision in the Agreement, which states:

> This Agreement will commence on the Effective Date and will continue for an initial Term of seven (7) years (the "Initial Term") unless sooner terminated as permitted herein. At the end of the Initial Term, the Agreement shall automatically renew for consecutive two-year terms (each a "Renewal Term") provided that at least one of [Advan]'s customers use products or data derived from the [Assignor] Data.

Ex. A. The Initial Term Clause and the Renewal Term Clause are, hereinafter, collectively referred to as the "Term Clauses."

70. In response, Outlogic pointed out that, because the term of the Agreement is indefinite, it is terminable at-will under the law of Virginia.

71. The Agreement is governed by Virginia law. Ex. A at 6 ("This Agreement and any dispute, disagreement, or issue of construction or interpretation arising hereunder whether relating to its execution, its validity, and the obligations provided therein or performance shall be governed or interpreted according to the internal laws of the State of Virginia without regard to choice of law considerations.").

72. Nevertheless, in an effort to resolve the parties' differences, Outlogic proposed that, in lieu of replacing the Agreement and Amendment entirely, the parties could adopt discrete amendments that would, principally, (a) address the privacy law concerns, and (b) clarify how the Term Clauses would work prospectively.

73. Although the parties agreed to execute a limited Second Amendment to address obvious privacy issues, Advan continues to assert that the Agreement is perpetual in nature and that it will not address Outlogic's other concerns over use of the Data without compensation.

74. Advan continues to assert this position notwithstanding that it has multiple suppliers of aggregated data and claims to use very little of what Outlogic provides.

75. Given Advan's refusal to address Outlogic's legitimate concerns regarding the term of the Agreement described above, Outlogic has no choice except to seek a declaration that it may terminate the Agreement, as amended, upon reasonable notice.

**COUNT I – Declaratory Judgment of Indefinite Terms**

76. Plaintiff adopts by reference and repeats and realleges each and every allegation set forth in Paragraphs 1 through 75 with the same force and effect as set forth under this cause of action.

77. The Supreme Court of Virginia has "long held that a contract to furnish services or a contract of employment for an indefinite period is, upon reasonable notice, terminable at will by either party." *Wards Co. v. Lewis & Dobrow, Inc.*, 210 Va. 751, 756 (1970). *See also McLean v. U.S.*, 316 F. Supp. 827, 831 (1970) ("A contract or lease for an indefinite period is terminable at will, upon reasonable notice, by either party."); *Town of Vinton v. City of Roanoke*, 195 Va. 881, 895 (1954) ("When a contract calls for the rendition of services and it is so incomplete that its intended duration cannot be determined by a fair inference from its terms, either party is, as a rule,

entitled to terminate it at will after reasonable notice of his intention to do so.”).

78. The period of intended duration for this Agreement cannot be determined by fair inference from the plain language of its Term Clauses.

79. Indeed, the Term Clauses run indefinitely until such unknown time as Advan chooses to opt out of the Agreement.

80. As such, Outlogic seeks a declaration by this Court that the Term Clauses in this Agreement are indefinite in duration under Virginia law and, consequently, this Agreement is terminable at will by either party upon reasonable notice.

81. An actual case or controversy exists between Outlogic and Advan because Outlogic has made it known to Advan that Outlogic believes the Agreement is terminable at will by either party upon reasonable notice, while Advan disagrees.[2]

82. A judicial declaration resolving this dispute is necessary and appropriate to allow the parties to ascertain their termination rights and duties under the Agreement.

---

[2] Outlogic previously sought a declaration regarding this issue. This Court ruled that the Initial Term was definite and, therefore, Outlogic did not have the right to terminate the Agreement prior to the expiration of the Initial Term. See Outlogic, LLC v. Advan Rsch. Corp., 682 F. Supp. 3d 407, 411-12 (S.D.N.Y. 2023). The Court also held that any controversy regarding the Renewal Term was not ripe because it was not certain whether it would be triggered. Id. On appeal, the Second Circuit upheld the Court’s decision on the Initial Term and held that the Court did not abuse its discretion in declining to rule on the indefiniteness of the Renewal Term. See Outlogic, LLC v. Advan Rsch. Corp, 2024 U.S. App. LEXIS 11855, *4-5 (2d Cir. May 16, 20224). The Second Circuit made clear, however, and Advan agreed, that the controversy would be ripe as soon as the first renewal period starts, which will be April 6, 2025. Id. at *6 n.3. Outlogic is filing this Complaint prior to April 6, 2025, to preserve its right to terminate the Agreement prior to the expiration of the first Renewal Term.

**PRAYER FOR RELIEF**

**WHEREFORE**, Outlogic prays that this Court declare that the Agreement's Term Clauses are indefinite and therefore the Agreement is terminable at will by either party upon reasonable notice. Outlogic further requests that this Court award the costs and disbursements of this action and such other relief as the Court deems appropriate.

Dated: New York, New York
March 20, 2025

Respectfully submitted,

OUTLOGIC, LLC

By: /s/ Sophia Ree

Mark S. Landman
Sophia Ree
Landman Corsi Ballaine & Ford P.C.
120 Broadway
New York, New York 10271
212.238.4880 Telephone
212.238.4848 Facsimile
mlandman@lcbf.com
sree@lcbf.com

and

Brett A. Spain (*pro hac vice* to be filed)
(VSB No. 44567)
Willcox & Savage, P.C.
440 Monticello Avenue, Suite 2200
Norfolk, Virginia 23510
757.628.5500 Telephone
757.628.5566 Facsimile
bspain@wilsav.com