# EXHIBIT A

# DATA MONETIZATION AGREEMENT

This Data Monetization Agreement (this "**Agreement**") is made and entered into as of the later of the two signature dates below ("**Effective Date**"), between x-Mode Social, Inc. **("X-Mode")**, a Delaware corporation with offices at 45662 Terminal Drive Sterling, VA 20166 and Advan Research Corporation, LLC ("**Licensee**"), a Delaware corporation with offices at 380 Lexington Ave, 17th Fl, New York NY 10168. This Agreement sets forth the parties' mutual understanding and agreement with respect to Licensee's receipt, use, distribution and/or licensing of the X-Mode Data (defined below) and any additional services described below ("**Services**") as may be mutually agreed by the parties and set forth in one or more schedules (each a "**Schedule**") attached hereto and made a part hereof. Additional Schedules may be added to this Agreement upon execution of each such Schedule by the parties and, upon such execution, each such additional Schedule shall be incorporated herein by reference.

**1. DEFINITIONS.**
"**Advertising ID**" means an advertising identifier found on mobile devices, such as an IDFA or an Android Ad ID.

"**Audiences**" means segments or classifications of Users that Licensee develops based upon X-Mode Data, solely where used in combination with Non-PII Data received from other sources. Examples of an "Audience" would be "Frequent Moviegoer" or "Interest: Sports."

"**Insights**" means analytics or research based on traffic or venue analysis based on X-Mode Data, where used in combination with Non-PII Data received from other sources, for commerce, marketing or other research purposes.

"**Licensee**" means a third party that obtains from Licensee a license to utilize X-Mode Data as permitted by this Agreement.

"**Laws**" means all applicable laws, rules, regulations, regulatory guidelines and self-regulatory guidelines, including, without limitation, (i) the Self-Regulatory Principles of the Digital Advertising Alliance ("**DAA**"), the Codes of Conduct of the Network Advertising Initiative ("**NAI**"), and the Principles of the European Interactive Digital Alliance ("**EDAA**"), as each may be amended from time to time; and (iii) data protection and privacy laws applicable in the country or countries where data is collected or held or otherwise processed.

"**MNPI**" means Material Non-Public Information as such is currently or in the future defined by the Securities and Exchange commission or any other governmental, state or local agency.

"**Non-PII**" means data or information (such as unique identifiers) that does not consist of or is not directly linked to PII, including information from which identifying information has been removed.

"**PII**" means information used or intended to be used to identify a particular individual, including, without limitation, name, address, email address, social security number, telephone number, financial account number and government-issued identifier.

"**X-Mode Data**" means Non-PII relating to Users that is provided or made available to Licensee by or on behalf of X-Mode, or that X-Mode has enabled Licensee to collect directly, during the Term of this Agreement, as further described in **Exhibit A**

"**X-Mode Media**" means any website, mobile website, mobile application or other online media owned, operated, or controlled by X-Mode, or from which X-Mode is otherwise authorized to collect X-Mode Data or make X-Mode Data available for purposes contemplated by this Agreement.

"**Licensee Code**" means any proprietary software code or data of the Licensee.

"**Licensee Materials**" means any proprietary Licensee Code, documentation provided by Licensee regarding its services, or any enhancements to the foregoing, that Licensee uses or makes available to X-Mode in connection with this Agreement.

"**User**" means a user of a website, mobile website, application or other online media to which X-Mode Data pertains.

**2. TERM AND TERMINATION.**
**a. Term.** This Agreement will commence on the Effective Date and will continue for an initial Term of seven (7) years (the "**Initial Term**") unless sooner terminated as permitted herein. At the end of the Initial Term, the Agreement shall automatically

renew for consecutive two-year terms (each a "**Renewal Term**") provided that at least one of Licensee's customers use products or data derived from the X-Mode Data, subject to the payment provisions set forth in Section 3.

**b. Termination.** If a party commits a material breach of this Agreement and fails to cure it within thirty (30) days after written notice by the non-breaching party describing such breach, the non-breaching party shall have the right to terminate this Agreement upon written notice (email sufficient) to the breaching party.

**c. Effect of Termination.** In the event that this Agreement is terminated for Licensee's breach, all licenses hereunder shall terminate, and Licensee shall have no rights to use the X-Mode Data, *provided that* (i) no later than thirty (30) days after the termination date, Licensee shall pay all moneys owed under this Agreement prior to termination, within thirty (30) days of termination, and (ii) Licensee will have the right, but not the obligation, to monetize Audiences that incorporate X-Mode Data that was provided to Licensee prior to termination or expiration for sixty (60) after the termination date (the "**Wind-Down Period**"); unless otherwise set forth in Exhibit A, as consideration for the right to do so during the Wind-Down Period Licensee shall pay to X-Mode (within 30 days of receipt of X-Mode's invoice) a fee equal to the Fees for the prior three (3) month period prior to notice of termination. Notwithstanding any other provision herein, any restrictions, obligations and other terms herein applicable during the Term shall apply during the Wind-Down Period.

**d. Survival.** Sections 1 (Definitions), 2(d) (Effect of Termination), 3 (Payments and Reporting) (to the extent of outstanding payment obligations), and 10 through 16, shall survive expiration or termination of this Agreement and the Wind-Down Period.

**3. PAYMENTS AND REPORTING**.

**a. Initial Monthly Fee.** During the Initial Term Licensee shall pay X-Mode fees as set forth in **Exhibit A** (the "**Fees**"). The Fees will be invoiced by X-Mode to Licensee at the beginning of each month in which X-Mode Data is to be provided.

The parties may amend this fee (or the manner in which or basis upon which fees are calculated) through an amendment or schedule signed by the parties, at any time.

Any and all payments shall be made exclusively in U.S. Dollars

**b. Payment of Fees**. Licensee shall pay (undisputed) amounts due and payable within fifteen (15) days of receipt of an invoice from the end of the period. Should Licensee fail to pay fees owed in a timely manner, X-Mode may suspend the delivery of X-Mode Data to Licensee (in its sole discretion) until Licensee pays all overdue payments. This suspension of the X-Mode Services does not exempt Licensee from paying invoices and undisputed fees/invoices. As to all past due amounts, X-Mode may charge interest which will equal to the lesser of (a) one and one-half percent (1.5%) per month, or (b) the maximum rate allowed by law. All payments are due and owing to X-Mode when Licensee has collected or received the corresponding amounts from (as applicable) Licensee's advertisers or customers.

**4. LICENSE TO X-MODE DATA.** The X-Mode Data shall be subject to the license grants, permissions and restrictions set forth herein and in Exhibit A.

**5. OWNERSHIP OF X-MODE DATA.** As between X-Mode and Licensee, X-Mode owns all rights, titles, and interests in the X-Mode Data, including without limitation any and all intellectual property rights therein; licenses, software, databases, and any and all data or information shared with Licensee, including any technology, designs, know-how, infrastructure and other technology used to collect, curate or transmit the X-Mode Data. For avoidance of doubt, the X-Mode Data is licensed, not sold, by X-Mode to Licensee. Licensee will not have any rights in or to X-Mode Data except as expressly granted in this Agreement. X-Mode reserves all rights to the X-Mode Data not expressly granted to Licensee in accordance with this Agreement.

**7. LICENSEE RESPONSIBILITIES.**

**a. Cooperation.** Licensee will cooperate reasonably with X-Mode to facilitate X-Mode's provision of X-Mode Data to Licensee and X-Mode's exercise of its rights under this Agreement. Licensee will provide X-Mode with instructions and access credentials to allow X-Mode to retrieve Licensee Code.

**b. Compliance with Laws.** Licensee will at all times comply with the laws and regulations of the United States applicable to its performance and receipt of rights and licenses under this Agreement.

**8. X-MODE RESPONSIBILITIES.**
**a. Cooperation.** X-Mode will cooperate reasonably with Licensee to facilitate Licensee's collection, transmission, use and analysis of, and access to, X-Mode Data and Licensee' exercise of its rights under this Agreement. X-Mode will use commercially reasonable efforts to provide Licensee with X-Mode Data as mutually agreed upon by the parties.

**b. Compliance with Laws.** X-Mode will comply with all Laws applicable to X-Mode's performance and obligations undertaken under this Agreement.

**c. Data and Delivery**. X-Mode warrants that (i) every data point included in the X-Mode Data represents a true cellphone observation,



**9. MUTUAL PRIVACY RESPONSIBILITIES.**
**a. Privacy Policies**. X-Mode shall prominently post a link on its website to a privacy policy, which shall in a legally sufficient manner describe (a) the types of data it collects, (b) the material ways in which it uses and shares such data, and (c) how consumers may opt out of cross-app ad targeting through mobile device settings.

**b. Respect for End User Preferences**. Where X-Mode passes to Licensee an "LMT" signal, flag, or integer that indicates a device user's advertising preference regarding receipt of interest-based advertising (i.e., based on Android or Apple device settings), Licensee shall respect that advertising preference and not use the user's mobile ad identifier for purposes of interest-based advertising (including without limitation cross-app advertising and geo-location based advertising).

**10. TAXES**. Except as waived by a valid Reseller Certificate, Licensee agrees to pay all applicable taxes or charges imposed by any government entity in connection with Licensee's use of the X-Mode Services (exclusive of taxes on X-Mode's income), or any Licensee products or services regarding Audiences or Insights.

**11. PUBLICITY.** Neither party will make a public announcement regarding the subject matter or existence of this Agreement, or any related discussions between the parties, without the prior written consent of the other party. Neither party shall disparage the other in any public statement, or to an actual or potential customer or business partner. The parties may agree in writing from time to time to participate in case studies and public relations activities.

**12. CONFIDENTIALITY.**
a. The parties acknowledge that, in the course of their dealings hereunder, each party (the "**Receiving Party**") may acquire information about the other party (the "**Disclosing Party**"), its business activities, operations, customers and vendors, its technical information and its trade secrets, all of which are proprietary and confidential (the "**Confidential Information**").
b. Each Receiving Party hereby agrees that: (i) all Confidential Information shall remain the exclusive property of the Disclosing Party; (ii) it shall use the Confidential Information of the Disclosing Party only as necessary in connection with the performance of its obligations or exercise of its rights under this Agreement; (iii) it shall maintain, and shall use commercially reasonable methods to cause its employees, contractors and agents (collectively, "**Representatives**") to maintain, the confidentiality and secrecy of the Confidential Information of the Disclosing Party provided, the Receiving Party shall safeguard all Confidential Information of the Disclosing Party with the same degree of care (which in no event shall be less than reasonable care) as the Receiving Party uses to protect its own Confidential Information; (iv) it shall use commercially reasonable methods to ensure that its Representatives do not copy, publish, disclose to others or use (other than pursuant to the terms hereof) the Confidential

Information of the disclosing party; and (v) it shall return or destroy all copies of Confidential Information of the Disclosing Party upon request of the Disclosing Party.

c. Notwithstanding the foregoing, Confidential Information shall not include any information of the Disclosing Party to the extent that it: (i) is or becomes a part of the public domain through no act or omission on the part of the Receiving Party; (ii) is disclosed to third parties by the Disclosing Party without similar confidentiality restriction on such third parties; (iii) is disclosed to the Receiving Party by a third party having no obligation of confidentiality with respect thereto; (iv) is independently developed by the Receiving Party without reference to or reliance on the Disclosing Party's Confidential Information; or (v) is released from confidential treatment by written consent of the Disclosing Party.

d. The Receiving Party hereby agrees to be responsible for any breach of this Agreement by its Representatives that have access, and to others that the receiving party, directly or indirectly, provides access to the Confidential Information.

e. In the event that the Receiving Party or its Representatives (the "**Compelled Party**") become legally compelled to disclose any of the Confidential Information, the Compelled Party shall, to the extent permitted by law, provide the Disclosing Party with prompt written notice of such requirement sufficient to permit the Disclosing Party to seek a protective order or other appropriate remedy. In the event that such protective order or remedy is not obtained, or in the event that the Disclosing Party waives compliance with the provisions hereof, the Compelled Party shall disclose only such portion of Confidential Information which the Compelled Party is advised by written opinion of counsel is legally required and shall exercise commercially reasonable efforts to obtain assurance that confidential treatment will be accorded such Confidential Information. In any event, the Compelled Party shall not oppose any action by the Disclosing Party to obtain an appropriate protective order or other reliable assurance that confidential treatment will be accorded the Confidential Information.

f. For purposes of this Section 12 (Confidentiality), references to disclosing party and receiving party shall include their respective Affiliates. An "**Affiliate**" means an entity that is controlled by or is under common control with a party hereto.

## 13. WARRANTIES; DISCLAIMER.

a. **Mutual Warranties.** Each party represents and warrants to the other that (a) it has the power and authority to enter into and perform its obligations under this Agreement; (b) this Agreement has been duly executed and delivered and constitutes a valid and binding agreement enforceable against such party in accordance with its terms; and (c) no authorization or approval from any third party is required in connection with such party's execution, delivery, or performance of this Agreement.

b. **X-Mode Warranties.** The X-Mode data and delivery schedule will conform to the requirements of section 8(c) herein. In the event of non-conformity, X-Mode shall make all commercially reasonable efforts to promptly correct the non-conforming X-Mode Data without charge. In the event the non-conformity persists for more than five (5) calendar days, and no similar alternative, in the Licensee's sole discretion, is made available to Licensee, the Licensee may terminate this agreement immediately upon written notice to X-Mode, in addition to any other remedies available to the Licensee, receive a refund of any applicable pre-paid fees.

c. **DISCLAIMER.** EXCEPT FOR THE EXPRESS REPRESENTATIONS AND WARRANTIES STATED IN THIS SECTION 13, NEITHER PARTY MAKES ANY ADDITIONAL REPRESENTATION OR WARRANTY OF ANY KIND, WHETHER EXPRESS, IMPLIED (EITHER IN FACT OR BY OPERATION OF LAW), OR STATUTORY, AS TO ANY MATTER WHATSOEVER. EACH PARTY EXPRESSLY DISCLAIMS ALL IMPLIED WARRANTIES, INCLUDING WITHOUT LIMITATION THOSE OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, QUALITY, ACCURACY, TITLE, QUIET ENJOYMENT AND NON-INFRINGEMENT. NEITHER PARTY WARRANTS THAT THE DATA OR SERVICES PROVIDED BY SUCH PARTY ARE ERROR-FREE OR THAT OPERATION OF SUCH PARTY'S PRODUCTS OR SERVICES WILL BE SECURE OR UNINTERRUPTED. NEITHER PARTY WILL HAVE THE RIGHT TO MAKE OR PASS ON ANY REPRESENTATION OR WARRANTY ON BEHALF OF THE OTHER PARTY TO ANY THIRD PARTY. THE X-MODE

Doc ID: 32457cdbf9f8c8124dbb8284159abef45680cb8d

DATA IS PROVIDED STRICTLY ON AN "AS IS" AND "AS AVAILABLE" BASIS.

**14. LIMITATION OF LIABILITY.**
EXCEPT FOR LIABILITY ARISING FROM A BREACH BY X-MODE OF ITS OBLIGATIONS IN SECTIONS 12 (CONFIDENTIALITY), , 13 (WARRANTIES) BUT EXCLUDING ANY WARRANTY BREACH OCCURING DUE TO X-MODE PERMANENTLY CEASING PROVIDING X-MODE DATA WHICH WOULD CURE SUCH BREACH TO ALL OF ITS OTHER CLIENTS, OR 15 (INDEMNIFICATION), NEITHER PARTY WILL BE LIABLE TO THE OTHER PARTY FOR: (1) ANY CONSEQUENTIAL, INCIDENTAL, SPECIAL OR EXEMPLARY DAMAGES ARISING OUT OF OR RELATED TO THIS AGREEMENT, INCLUDING BUT NOT LIMITED TO LOST PROFITS, REPUTATIONAL DAMAGE OR LOSS OF BUSINESS, EVEN IF A PARTY IS OR SHOULD HAVE BEEN APPRISED OF THE LIKELIHOOD OF SUCH DAMAGES OCCURRING AND REGARDLESS OF THE THEORY OF LIABILITY, THE TYPE OF CLAIM OR THE FORUM OF THE PROCEEDING; NOR FOR (2) ANY DAMAGES IN EXCESS OF THE TOTAL AMOUNT PAID BY LICENSEE TO X-MODE UNDER THIS AGREEMENT IN THE SIX MONTHS PRECEDING THE DATE OF THE CLAIM.

**15. INDEMNIFICATION**

**a. Mutual Indemnification.** Each party ("Indemnifying Party") hereby indemnifies and agrees to defend and hold harmless the other party ("Indemnified Party") and its affiliates, directors, officers, employees, agents, and representatives from and against any and all demands, claims, actions, proceedings, damages, liabilities, losses, fees, costs, or expenses, including, without limitation, reasonable attorneys' fees and the costs of any investigation, directly or indirectly arising from or related to the breach by Indemnifying Party of any representation it has made herein; or (b) any negligence, gross negligence, or willful misconduct by Indemnifying Party or its employees or agents.

**b. Indemnification Procedures.** The obligations of the Indemnifying Party to defend, indemnify, and hold harmless the Indemnified Party and its respective directors, officers, employees, agents, and representatives shall be subject to the following: (a) the Indemnifying Party shall provide the Indemnified Party with prompt notice of the claim giving rise to such obligation; provided, however, that any failure or delay in giving such notice shall only relieve the Indemnifying party of its obligation to defend, indemnify, and hold the Indemnified Party harmless to the extent it reasonably demonstrates that its defense or settlement of the claim or suit was adversely affected thereby; (b) the Indemnifying Party shall have sole control of the defense and of all negotiations for settlement of such claim or suit; provided, however, that the Indemnifying Party shall not settle any claim unless such settlement completely and forever releases the Indemnified Party from all liability with respect to such claim or unless the Indemnified Party consents to such settlement in writing (which consent shall not be unreasonably withheld); and (c) the Indemnified Party shall cooperate with the Indemnifying Party in the defense or settlement of any such claim or suit.

**16. GENERAL.** Notwithstanding anything in this Agreement to the contrary, each party shall be entitled to seek injunctive or other equitable relief, including a restraining order, specific performance and any other temporary or permanent relief that may be available, to enforce the terms of this Agreement, including, without limitation, each party's rights with respect to the protection of its respective Confidential Information and/or the protection of its respective intellectual property rights. Any notice, report, approval or consent required or permitted hereunder shall be in writing and will be deemed to have been duly given if delivered personally, mailed by first-class, registered or certified U.S. mail, postage prepaid, return receipt requested or via overnight delivery service to the respective addresses of the parties as set forth below (or such other address as a party may designate).  or sent via confirmed email, provided that the date of the email shall control, and provided further that a physical copy of such notice is promptly sent to recipient's address as set forth below. The parties shall not be deemed to be partners, joint venturers, employers, employees or each other's agents, and no party shall have the right to act on behalf of any other except as expressly agreed in writing.  This Agreement may be executed in counterparts, each of which will be deemed an original and all of which together will constitute one and the same document. The failure of either party to

insist upon or enforce strict performance by the other party of any provision of this Agreement or to exercise any right under this Agreement will not be construed as a waiver or relinquishment to any extent of such party's right to assert or rely upon any such provision or right in that or any other instance; rather, the same will be and remain in full force and effect. Neither party may assign this Agreement or assign or delegate its rights or obligations under the Agreement without the prior written consent of the other party, which consent shall not be unreasonably withheld or delayed. Any assignment or attempted assignment by either party without the other party's written consent shall be null and void. Notwithstanding the preceding to the contrary, either party shall have the right to assign this Agreement to an Affiliate or any successor to its business or assets to which this Agreement relates, whether by merger, sale of assets, sale of stock, reorganization or otherwise, provided that prompt notice of the same shall be given to the other party. This Agreement will be binding upon and inure to the benefit of the parties and their respective permitted successors and permitted assigns. Neither party will be liable for, or be considered to be in breach of or default under this Agreement on account of, any delay or failure to perform as required by this Agreement as a result of any cause or condition beyond such party's reasonable control (including, without limitation, any act or failure to act by the other party). The captions in this Agreement are provided for convenience only and shall not affect its interpretation. This Agreement and any dispute, disagreement, or issue of construction or interpretation arising hereunder whether relating to its execution, its validity, and the obligations provided therein or performance shall be governed or interpreted according to the internal laws of the State of Virginia without regard to choice of law considerations. The exclusive venue for any action relating this Agreement shall be in a court of competent jurisdiction located in the State of New York. This Agreement, including the attached Exhibits set forth (or later agreed to) are the final and entire Agreement and supersede any and all prior agreements of the parties with respect to the transactions set forth herein. The parties have participated jointly in the negotiation and drafting of this Agreement. If any provision of this Agreement shall be adjudged by any court of competent jurisdiction to be unenforceable or invalid, that provision shall be limited or eliminated to the minimum extent necessary so that this Agreement shall otherwise remain in full force and effect and enforceable.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date written above.

**X-Mode Social, Inc.**

By:

Name: Joshua Anton

Title: CEO, X-Mode Social, Inc

Date: 04/06/2018

**Licensee**

By:

Name: Yiannis Tsiounis

Title: CEO

Date: 04/06/2018

# Exhibit A

**1.     X-Mode Data To Be Provided ("X-Mode Collected Data").** ███████████
███████████████
█
██████████
████████████
███████████
██████████
███████████
████████████
█████████████
████████████
█████████████
████████████

**2.     Fees To Be Paid.**  Licensee shall pay the following Fees, on a monthly or CPM basis, as set forth below and under provisions further set forth in the Agreement:



**3.     License Granted to X-Mode Data, and Applicable Restrictions.**  X-Mode hereby grants to Licensee a worldwide, term-limited (including the Wind-Down period set forth in Section 2(c)) license to access and use the X-Mode Data described above (i) to create Audiences, and (ii) to create Insights.

**4.     License Limitations; Reservation of Rights.**     Licensee may use X-Mode Data solely as expressly authorized by this Agreement. In particular (and without limiting the foregoing), Licensee may not:

(a) license X-Mode's raw location data alone in its unaltered form,
(b) use the X-Mode Data (alone or combined with other data) to promote any illegal product, or engage in any illegal purpose;
(c)  use the X-Mode Data (alone or combined with other data) to associate any user, device or individual with any venue that is related to healthcare, addiction, pregnancy or pregnancy termination, or sexual orientation, or to otherwise infer an interest or characteristic related to any of the foregoing;

(d) use any X-Mode Data (alone or combined with other data) for the purposes of making decisions about a User's eligibility for employment, health care, credit or insurance, or for any other purpose that is covered by the Fair Credit Reporting Act;

(e) de-compile or reverse engineer the X-Mode Data to re-identify an anonymous user, such as by associating PII with de-identified X-Mode Data (such as location data or an advertising identifier). To clarify one exception, Licensee may use X-Mode's location data combined with other data sets to match a lat/long to a location or venue visited by a user.



# Audit Trail

|  |  |
|---|---|
| **TITLE** | X-Mode Data Monetization Agreement - Advan |
| **FILE NAME** | X-Mode Data Monet...ts v2 (1) (2).pdf |
| **DOCUMENT ID** | 32457cdbf9f8c8124dbb8284159abef45680cb8d |
| **STATUS** | ◾ Completed |

## Document History



**04/06/2018**
16:19:59 UTC-5

Sent for signature to Yiannis Tsiounis (yiannis@advan.us) and Joshua Anton (josh@xmodesocial.com) from jamie@xmodesocial.com
IP: 73.251.115.244



**04/06/2018**
16:20:17 UTC-5

Viewed by Yiannis Tsiounis (yiannis@advan.us)
IP: 38.105.182.130



**04/06/2018**
16:22:02 UTC-5

Signed by Yiannis Tsiounis (yiannis@advan.us)
IP: 38.105.182.130



**04/06/2018**
16:26:08 UTC-5

Viewed by Joshua Anton (josh@xmodesocial.com)
IP: 107.77.202.69



**04/06/2018**
16:26:37 UTC-5

Signed by Joshua Anton (josh@xmodesocial.com)
IP: 107.77.202.69



**04/06/2018**
16:26:37 UTC-5

The document has been completed.